## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

CHRIS CARTY,                          )
                                     )
                                     )
            Plaintiff,               )
                                     )          Civil No. 2023-15
      vs.                            )
                                     )
WYNNIE TESTAMARK, *et al.*,           )
                                     )
                                     )
            Defendants.              )

## REPORT AND RECOMMENDATION

Before the Court is a *pro se* motion for temporary restraining order and preliminary injunction filed by plaintiff Chris Carty, an inmate currently incarcerated at the John A. Bell Adult Correctional Facility on St. Croix. [ECF 5]. For the reasons explained below, the Court recommends that the District Court deny plaintiff's motion for injunctive relief.

## I.    BACKGROUND[1]

On March 31, 2023, plaintiff filed a *pro se* complaint under 42 U.S.C. § 1983 and a memorandum in support of a motion for temporary restraining order and preliminary injunction. [ECFs 1 & 5].[2] Plaintiff contends he is being held in a "torturous cell" in solitary confinement and subject to "inhumane conditions," and lists 19 counts of constitutional rights violations: (1) deprivation of all property, (2) excessive use of force, (3) segregated confinement, (4) atypical significant hardship, (5) cruel and unusual punishment, (6) denial of showers, (7) denial of food,

---

[1] The following summary includes only the information most pertinent to plaintiff's motion for injunctive relief. See this Court's July 3, 2023 Order [ECF 29] for a more detailed procedural history and factual basis of Carty's claims.

[2] On order by the Court, plaintiff filed an amended complaint on May 10, 2023. [ECF 10]. He also filed a second motion for temporary restraining order and preliminary injunction. [ECF 11]. This second filing is largely a duplicate of plaintiff's original motion, with minor changes. On May 19, 2023, plaintiff filed an affidavit in support of his preliminary injunction motion. [ECF 19].

*Carty v. Testamark, et al.*
Civil No. 2023-15
Page 2

(8) denial of recreation and exercise, (9) denial of law library, (10) "personal safety," (11) sexual abuse, (12) tampering with food, (13) denial of medical care, (14) denial of mental health care, (15) denial of church services, (16) denial of programs/classes, (17) denial of water/ice, (18) denial of hygiene, and 19) denial of prescribed mattress.   [ECF 10] at 2, 5.

Plaintiff seeks damages (compensatory and punitive), and prospective injunctive relief in the form of an order (1) to ensure he receives his basic needs, such as showers, outside recreation and exercise, three meals per day, return of his property and legal materials, return of his prescribed medical mattress, access to the law library, medical and dental services, mental health services, and attendance at church and classes/programs, (2) to stop all present and future tampering with his food trays, (3) to stop all present and future acts of excessive force, (4) to protect plaintiff from present and future sexual abuse by staff, (5) to protect plaintiff from present and future conspiracies by staff to harm him, and (6) to immediately release him from solitary confinement.   [ECF 10-1] at 11, 18.

As in the complaint, plaintiff's motion for injunctive relief alleges he is being held under torturous conditions in solitary confinement, denied his basic needs, and subject to physical and mental abuse by Bureau of Corrections ("BOC") staff.   *See* [ECFs 5 & 11].   Plaintiff asserts that all four factors a court must consider prior to granting injunctive relief weigh in his favor:   First, defendants' conduct is a clear violation of the Eighth Amendment, and the continuing deprivation of his constitutional rights constitutes irreparable harm.   [ECF 11] at 1–2.   Second, the balance of hardships weighs in his favor because his present and potential suffering are enormous, and the transferring of plaintiff to a suitable housing area "amounts to no more than business as usual" for defendants.   *Id.* at 2.   Third, plaintiff asserts "a great likelihood of success on the merits" because defendants are violating the Eighth Amendment.   *Id.* at 3.   Finally, "it is always in the public

interest for prison officials to obey the law." *Id.* Plaintiff seeks (1) an order requiring defendants Adams and Testamark to show cause at a hearing why a preliminary injunction should not issue, and (2) an immediate order directing Adams and Testamark to "have all necessary measures taken" to stop the tampering with plaintiff's food trays and acts of excessive force upon him, to protect him from sexual abuse by staff, and to release him from segregated confinement. [ECF 11-2].

In opposition, defendants argue Carty has not shown entitlement to injunctive relief because he has not established a substantial likelihood of success on the merits of his claims, and further that Carty's own exhibits contradict his assertions. [ECF 48] at 1, 4.[3] Defendants have submitted evidence that shows the following: In response to Carty's allegations of medication and meal tampering in July 2021, he was seen by the nurse and assured that "the medications [] he is receiving are the same ones [] he has always received." [ECF 76-2]. The interim warden made special arrangements to have only the cook handle Carty's food and to wrap his meals. [ECF 76-3].[4] As to Carty's claim that he is denied meals, the BOC Segregation Activity Record documents numerous occasions that Carty refused meals. [ECFs 81–83 ].[5]

---

[3] On July 3, 2023, the Court issued an Order granting plaintiff's motion to proceed *in forma pauperis* and directing the Attorney General for the Territory of the Virgin Islands to file a response to plaintiff's motion for preliminary injunction. [ECF 29]. Defendants timely filed their opposition on August 15, 2023. [ECF 48]. The Court found defendants' submission inadequate and ordered further briefing [ECF 71], and on November 2, 2023, defendants filed their supplemental memorandum and supporting exhibits [ECFs 75–84].

[4] In response to Carty's further allegations of meal tampering in 2022, Chief Grant monitored the meal distribution and brought Carty his plate, but he refused to take the meal. [ECF 10-5] at 3.

[5] The BOC responded to Carty's claims of not being fed in a March 31, 2023 letter, stating:

> After reviewing footage, and checking the log book, you have consistently refused food from certain officers, certain officers do not want to go by your door because of you consistently throwing bodily fluids after them. And you refuse to take food from the orderlies. To fix this issue YOU, Inmate Chris Carty, must accept the food that is offered to you. It is totally your decision on whether you get your food or not.

[ECF 10-4] at 3; *see also* [ECF 10-5] at 3 (January 18, 2023 letter from Chief Grant stating: "You keep stating that you are not being fed, when you are the one who is refusing the meals due to you not trusting anyone. . . . It is your

Carty requested to be seen by medical in October 2019, stating he was unable to eat because he was not receiving his correct medical diet. [ECF 76-4]. He was seen on October 22, 2019, and weighed 158 pounds. *Id.* In 2020, his weight fluctuated between 157 and 164 pounds. [ECF 91-1] at 1. From 2021 until November 2022, his weight fluctuated from 150 to 156 pounds. *Id.* at 1–2. Carty weighed 139 pounds in December 2022, and 137 pounds in August 2023. *Id.* at 2.

In April 2023, Carty told the nurse his fingernails appeared to have fungus growth and was given Lotrimin. *See* [ECFs 77 & 77-1]. Dr. Callwood then evaluated pictures of Carty's nails and stated they showed a vitamin deficiency, and prescribed biotin, vitamin D, and a multivitamin. [ECF 77]. The nurse provided the supplements to Carty on April 21, 2023, and encouraged him to eat his meals and participate in recreation. [ECF 77-1]. Carty previously received vitamin D in 2022 and 2019. *See* [ECF 77-3] (medication log); [ECF 77-2] at 1 (discharge summary from Wellpath Recovery Solutions noting vitamin D deficiency).

Defendants also provided evidence related to Carty's allegations of excessive force and sexual assault. According to the complaint, in 2022, CO Nurse used pepper spray against Carty in an unauthorized manner after accusing Carty of trying to spray him with Lysol. [ECF 10] ¶ 20. Sargent Dana Grant reviewed video footage of this incident and saw Carty spray CO Nurse and then CO Nurse used pepper spray on Carty. [ECF 50-1]. Carty was reportedly assessed by the nurse for any injuries. *Id.*[6]

---

choice that you continuously refuse to take the meals that are being offered to you.").

[6] Additionally, Carty claims CO Santiago hit him in the face and held him against the wall during an April 2022 incident, and that Carty's request for medical assistance for bruises and muscle aches was denied. [ECF 10] ¶¶ 35–37. Plaintiff filed a grievance for this incident (# 20220410) but did not allege any injuries or denial of medical care. *See* [ECF 1-11] at 8; [ECF 77-4]. Warden Adams reviewed surveillance footage and found no evidence to support Carty's allegations. [ECF 1-11] at 10.

Carty alleged sexual assault by CO Burroughs in April 2022, stating Burroughs "deliberately grind his front part against plaintiff buttocks" while he was bending over to get some water. [ECF 10] ¶ 24. His grievance was forwarded to the Prison Rape Elimination Act ("PREA") Coordinator for investigation and determined unfounded. [ECFs 77-6, 77-7]. A previous allegation of sexual assault by Burroughs in December 2019 was investigated and found to be unsubstantiated. [ECFs 78, 78-1].

On March 30, 2023, Carty threw a cup of urine on Officer Santiago. [ECF 78-3] at 3. Officers employed a "calculated use of force" to remove containers holding bodily fluids from his cell. [ECF 78-2] at 1. The Use of Force Report indicates Carty fell on his face and was pepper sprayed and punched twice in the face, and his arm was injured by the stun shield. [ECF 78-3] at 1–2. Carty was assessed by prison medical staff and reported tenderness of the left jaw and pain with opening and closing his mouth. [ECF 78-4] at 1. The provider documented no abrasions or lacerations to the face, no mouth bleeding, and one tiny abrasion to the right ankle. *Id.* at 2. Carty refused an icepack for his jaw but requested x-rays, and was sent to Juan F. Luis Hospital for further evaluation. *Id.* at 1–2. Scans of the left forearm, face, chest, abdomen, and pelvis all came back normal. [ECF 78-5] at 3–5. Carty was discharged with instructions for Tylenol and "RICE" as needed for pain. *Id.* at 6. The prison nurse saw Carty the following day and he refused any pain medication, stating "I'm fine." [ECF 78-6].

The prison conducted an investigation into Carty's allegations that he was being denied showers and recreation and determined these claims were false. *See* [ECF 79-6] (June 29, 2022 report).[7] Rather, Carty was refusing these activities because he did not want to be placed in full

---

[7] *See also* [ECFs 79, 79-1, 79-2] (grievances alleging denial of showers and recreation); [ECFs 79-3, 79-4, 79-5] (BOC response stating allegations will be investigated and corrected if substantiated).

restraints to exit his cell. *Id.*; *see* [ECFs 81–83] (Activity Record documenting dates that Carty

refused recreation and showers because he did not want be placed in restraints).[8]   In response to

Carty's claim that his cell lacks proper furnishings, running water, clean clothing, or hygiene

supplies,[9] the report states "[i]t is a known fact" that Carty's cell "was modified specifically for

him . . . in an effort to curtail the attacks being perpetuated by [] Carty," including throwing bodily

fluids on staff.   [ECF 79-6].[10]   The report further states that because of these and other acts of

violence, Carty is held under a disciplinary/punitive designation in the segregated housing unit.

And, per BOC policy, upon such placement, "the Inmate/Detainee's property will be confiscated

by the officer and placed in storage."   *Id.*

## II.    LEGAL STANDARDS

Parties may seek preliminary injunctive relief under Rule 65 of the Federal Rules of Civil

Procedure.[11]   A court must determine whether the movant has shown: "(1) a likelihood of success

on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting

preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the

public interest favors such relief."   *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.

---

[8]  In a sworn affidavit, Acting Warden Dana Grant explained that "[a]s a result of his extremely violent tendencies, including his habit of throwing cocktails of urine and feces at staff and other inmates, [Carty] is required to exit his cell in full restraints to traverse to the [shower and] rec area[s]."   [ECF 48-1] ¶¶ 10–11.

[9]  *See* [ECF 78-7] (grievance # 20220402).

[10]  *See also* [ECF 81] at 2–6, 8–9, [ECF 82] at 3, 5 (Activity Record documenting Carty throwing urine, feces, water, and rocks at BOC staff, spitting on staff and inmates, and threatening staff); [ECF 10-6] at 2 (grievance response stating cell has running water).

[11]  The Court may issue a temporary restraining order only if specific facts clearly show that the movant will suffer immediate and irreparable injury if relief is not granted before the adverse party is given notice and an opportunity to respond.  Fed. R. Civ. P. 65(b).   Because defendants have been notified and ordered to respond to Carty's motion, a temporary restraining order is not applicable, and the motion is properly considered as one for preliminary injunctive relief.   *See* Fed. R. Civ. P. 65(a).

*Carty v. Testamark, et al.*
Civil No. 2023-15
Page 7

2004).[12] "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.*, 428 F.3d 504, 508 (3d Cir. 2005); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" (citation omitted)). Moreover, a court may not grant the movant's request without satisfying the likelihood of success and irreparable injury elements, regardless of what the equities require. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).

Injunctive relief "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (citation omitted); *see also Adams*, 204 F.3d at 487 (recognizing "the extraordinary nature of the preliminary injunction power" and the Third Circuit's "repeated[] insiste[nce] that the use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter"). "The purpose of a preliminary injunction is to preserve the status quo," *Anderson v. Davila*, 125 F.3d 148, 156 (3d Cir. 1997), and thus one should only be granted when necessary to "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Further, when the Rule 65 motion "is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621

---

[12] "The test for a preliminary injunction and a temporary restraining order are the same." *Smith v. Litton Loan Servicing, LP*, 2005 WL 289927, at *6 (E.D. Pa. Feb. 4, 2005).

F.2d 578, 582 (3d Cir. 1980).

"Moreover, in the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Coulston v. Glunt*, 2015 WL 6452379, at *2 (W.D. Pa. Oct. 26, 2015) (internal quotations and citation omitted). Thus, "[w]here a plaintiff requests an injunction that would require the Court to interfere with the administration of a prison, 'appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.'" *Id.* (quoting *Rizzo v. Goode,* 423 U.S. 362, 379 (1976)). These limitations on the power of courts to enter injunctions in a correctional context are further underscored by statute. The Prison Litigation Reform Act ("PLRA") limits the authority of courts to enjoin the exercise of discretion by prison officials and requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(2); *see also Punnett*, 621 F.2d at 587 ("when the preliminary injunction provides for mandatory relief, it is particularly appropriate to weigh the possible harm to other interested parties").

Finally, "[i]t is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits,'" *Kos Pharms.*, 369 F.3d at 718 (quoting *Univ. of Tex.*, 451 U.S. at 395), and "an evidentiary hearing is not always required." *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 324 (3d Cir. 2015). "[A] district court is not obliged to hold a hearing when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm[,] . . . [or] if the movant is proceeding on a legal theory which cannot be sustained." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990).

"[W]here the motion turns on a disputed factual issue, [however,] an evidentiary hearing is ordinarily required." *Kos Pharms.*, 369 F.3d at 719 n.16.[13]

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

Under the first factor, the movant must "make a prima facie case showing a reasonable probability that it will prevail on the merits." *Punnett*, 621 F.2d at 583.   On the record before the Court, it cannot be determined that Carty is reasonably likely to succeed on the merits of his claims, particularly in light of the deference a court must give to prison officials.[14]

First, Carty cannot show a reasonable likelihood of success on his conditions of confinement claim because it is unsupported by the factual record and the law.   "While the Constitution 'does not mandate comfortable prisons,'" conditions of confinement that "violate contemporary standards of decency" and deprive inmates of "the minimal civilized measures of life's necessities" violate the Eighth Amendment's proscription against cruel and unusual punishment.   *Carty v. Farrelly*, 957 F. Supp. 727, 734–35 (D.V.I. 1997) (citations omitted). However, an inmate is not entitled to relief simply because of exposure to uncomfortable or inconvenient conditions of confinement— "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."   *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   Accordingly, to prevail on a conditions of confinement claim, an inmate must show (1) an objectively, sufficiently serious

---

[13] As set forth below, based on the evidence of record, plaintiff here has failed to meet his heavy burden to show that injunctive relief is warranted.   The Court therefore finds that no hearing is necessary.   *See Bradley*, 910 F.2d at 1176.

[14] To be clear, the Court draws its conclusions based on the preliminary record currently before the Court.   At this stage of the proceedings, the Court's analysis is focused on whether Carty has presented a colorable factual basis to support his claims on the merits and his contention of irreparable harm sufficient to show entitlement to injunctive relief.   The Court is not commenting on the ultimate merits of Carty's claims.

deprivation of life's necessities, and (2) the prison official acted with deliberate indifference by knowing of and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *accord Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020).[15]

Here, Carty alleges deprivation of his personal property, but this condition is dictated by BOC policy for inmates held in disciplinary segregation. There is no evidence indicating Carty requested but was denied access to the law library, church services, or classes.[16] Carty alleges he is denied showers and recreation, but the records submitted by defendants show Carty routinely refuses these things.[17] Carty also alleges tampering with his meals and medications, but there is no evidence to support these allegations or his claimed symptoms of dizziness, confusion, and high blood pressure.[18] Further, while Carty's allegations of meal deprivation and significant weight loss raise concern, they are not born out by the record. Rather, the Activity Record and BOC grievance responses indicate Carty often refuses the food offered to him,[19] and the medical records

---

[15] To be found liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838.

[16] *See Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("There is a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence."), *superseded by statute on other grounds*, 42 U.S.C. § 1997e(a), *as recognized in Nyhuis v. Reno*, 204 F.3d 65 (3d Cir. 2000).

[17] Carty may object to the requirement that he be placed in full restraints to exit his cell for showers, recreation, and medical appointments, but the record makes clear that it is plaintiff's own actions, and not the defendants' conduct, that resulted in his restriction from these activities.

[18] *See, e.g.*, [ECF 76-2] (nurse assured Carty his medications were unchanged; he was in no distress and his vital signs were normal); [ECF 88-2] (October 28, 2023 BOC response to allegation of meal tampering, stating Warden Grant reviewed video footage and complaint was unsubstantiated).

[19] *See* [ECF 10-4] at 3 (March 31, 2023 response to grievance # 20230303, stating: "After reviewing footage, and checking the log book, you have consistently refused food from certain officers . . . And you refuse to take food from the orderlies."); [ECF 10-5] (January 18, 2023 response to grievance # 20221204, stating Chief Dana Grant personally monitored the meal distribution and brought Carty his plate, but he still refused the food); *see generally* [ECFs 81–83] (Activity Record).

document at most a 15-pound weight loss from 2021 to 2023.[20, 21, 22]   Thus, Carty has not shown

an objectively, sufficiently serious deprivation, and defendants have adduced evidence rebutting

Carty's allegation that they were deliberately indifferent to his concerns.[23, 24]

To the extent Carty alleges claims for denial of medical and mental health care, he also has

not shown a reasonable likelihood of success on such a claim.   To prevail on an Eighth

Amendment failure to treat claim, a plaintiff must prove (1) he had a serious medical need, and (2)

acts or omissions by prison officials that show deliberate indifference to that need.   *Rouse v.*

*Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976));

*see Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("A serious medical need exists where

---

[20] *See* [ECF 91-1] (weight log showing a consistent weight of 150–53 pounds throughout 2021 and 2022, dropping to 139 in December 2022 and 137 in August 2023).   The Court notes that in his most recent affidavit dated December 9, 2023, Carty alleges his weight is now 124 pounds.   [ECF 101].   The record reflects that Carty is offered meals but refuses them; it is not surprising that his refusal to consume food would result in weight loss.

[21] Additionally, the prison has taken corrective action as to Carty's recent allegation that he was denied soup because of a containers restriction.   *See* [ECF 93] (November 28, 2023 affidavit).   On December 1, 2023, Carty filed a grievance stating prison officials were using this restriction to deprive him of three square meals per day, and that "because of these continue [sic] violations Carty continues to lose excessive amount of weight."   [ECF 97-1].   The BOC responded on December 6, 2023, and acknowledged that Carty had been restricted from receiving food served in containers because he was using the cups to store feces, and noted that on the day in question, Carty received a double portion of pizza and was not denied any meals.   [ECF 97-2].   The letter further stated it was the BOC's responsibility to feed Carty and that going forward he would not be denied food served in containers.   *Id.*

[22] As well, Carty's claimed diagnosis of malnutrition from lack of food and sunlight appears nowhere in the record.   Rather, the medical record indicates Dr. Callwood assessed a vitamin deficiency and prescribed biotin and vitamin D, and encouraged Carty to eat his meals and participate in recreation.   And, as defendants point out, Carty has a history of vitamin D deficiency and previously took supplements at Wellpath in 2019.

[23] "At a minimum, a correctional institution satisfies its obligations under the Eighth Amendment when it furnishes prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety."   *Young*, 960 F.2d at 364.

[24] The Court notes Carty has raised similar claims in prior cases before this Court.   *See* 16-cv-56-WAL [ECFs 1 & 2] (alleging tampering with meals, starvation, and excessive weight loss); 15-cv-22-WAL [ECFs 1 & 2] (excessive force, sexual harassment, deprivation of property, inadequate medical care, serving spoiled food and tampering with meals, and denial of showers, recreation, and meals).   Carty has also raised similar claims in the Western District of Virginia.   *See* W.D. Va. case no. 12-cv-28-SGW [ECF 50] (sexual abuse, deprivation of property, segregated confinement, denial of meals); W.D. Va. case no. 13-cv-234-JPJ [ECF 15] (deprivation of property, denial of showers and recreation, tampering with meals, denial of medical diet, starvation, and weighing less than 100 pounds).

'failure to treat can be expected to lead to substantial and unnecessary suffering,' and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person.   Officials are deliberately indifferent to such needs when they are actually aware of a substantial risk of serious harm and disregard that risk." (citation omitted)).   Carty has not alleged any specific facts in support of either.[25]

As to Carty's excessive force claim, "[t]he Eighth Amendment guarantees the right to be free from 'cruel and unusual punishments' while in custody," *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018), and thus "serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified."   *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).   To bring such a claim, an inmate must allege both a subjective and an objective element:   "First, it must appear from the complaint that the defendant official acted with a 'sufficiently culpable state of mind.'   Second, the conduct must have been objectively 'harmful enough,' or 'sufficiently serious' to violate the Constitution."   *Ricks*, 891 F.3d at 473 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).   Whether such a claim is likely to prevail is a fact intensive analysis viewed through the lens of discretion granted to prison officials to administer their prisons.   The "core judicial inquiry is . . . whether force was applied in a good-

---

[25] Further, the record shows Carty has received medical care.   *See, e.g.*, [ECFs 77, 77-1] (treatment for vitamin deficiency); [ECFs 78-4, 78-5, 78-6] (treatment by BOC and hospital following extraction incident); [ECF 81] at 7, 9 (visits with a mental health counselor); [ECF 83] at 13 (lab draw).   In a grievance dated July 22, 2023, Carty stated he had requested but been denied medical assistance "for a very long time now."   [ECF 59-1] at 1.   He specifically requested dental care and listed symptoms including weight loss, hair loss, dizziness, blurry vision, tiredness, ear pain, and upper respiratory issues.   *Id.*   The head nurse responded on August 17, 2023, stating Carty was seen on August 2, 2023.   *Id.*   His most recent lab draw was on April 11, 2023, and his current medications were vitamin D, biotin, and a multivitamin.   *Id.*   Carty was called for medical and dental on August 16, 2023, but he refused.   *Id.*; *see also* [ECF 82] at 3 (refusal to go to medical on June 6, 2022 because he did not want to be placed in restraints).   "[M]ere disagreement as to proper care does not support a finding of deliberate indifference . . . because the right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice."   *Plaza v. Presbury*, 2023 WL 4567718, at *3 (E.D. Pa. July 17, 2023) (internal quotations and citations omitted).   Nor has Carty shown that any of the named defendants possessed actual knowledge or a reason to believe that prison medical staff were mistreating or not treating him.   *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

*Carty v. Testamark, et al.*
Civil No. 2023-15
Page 13

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *accord Smith v. Mensinger*, 293 F.3d 641, 648 (3d

Cir. 2002) ("Eighth Amendment analysis must be driven by the extent of the force and the

circumstances in which it is applied; not by the resulting injuries").[26]

Here, Carty alleges defendants unreasonably used excessive force against him on multiple

occasions.   But as detailed above, his allegations of unconstitutional punishment are contradicted

by the record.   For example, the record indicates CO Nurse deployed pepper spray in self-defense

after Carty first sprayed him with Lysol,[27] and the swat team was called in after Carty threw urine

on CO Santiago and refused to surrender the urine bottle.   While the Court cannot say at this

juncture that plaintiff has zero chance of success on these claims, the record shows Carty played a

role in creating a disturbance and suggests that defendants' use of force "was applied in a good-

faith effort to maintain or restore discipline."   *Hudson*, 503 U.S. at 7.   And, while the Court's

analysis is not driven by the resulting injuries, the medical records here do not substantiate Carty's

claim that the cell extraction incident left him unable to open his mouth or eat solid food for 3–4

weeks, and there is no evidence that any provider ordered a liquid diet or other restrictions.   Thus,

in light of the record as a whole, Carty has not shown that he was subject to excessive force rising

to the level of cruel and unusual punishment necessary to show a reasonable probability of success

---

[26] Courts look to five factors to evaluate the officer's intent:

> (1) the need for the application of force; (2) the relationship between the need and
> the amount of force that was used; (3) the extent of the injury inflicted; (4) the
> extent of the threat to the safety of staff and inmates, as reasonably perceived by
> responsible officials on the basis of facts known to them; and (5) any efforts made
> to temper the severity of the forceful response.

*Ricks*, 891 F.3d at 480.   The objective component "is met when 'the inmate's injury was more than *de minimis*.'"   *Id.* (citation omitted).

[27] *See Passmore v. Ianello*, 528 F. App'x 144, 147–48 (3d Cir. 2013) ("use of tear gas is not 'a per se violation of the Eighth Amendment'" (citation omitted) (collecting cases)).

on the merits of this claim.

Courts apply the same framework for excessive force claims set forth in *Hudson* to claims for sexual abuse and harassment by prison officials.    *Ricks*, 891 F.3d at 474.    Thus, to prevail on such a claim, (1) "the incident must be objectively, sufficiently intolerable and cruel, capable of causing harm," and (2) "the official must have a culpable state of mind."    *Id.* at 475.    As to the subjective prong, courts "consider whether the official had a legitimate penological purpose or if he or she acted 'maliciously and sadistically for the very purpose of causing harm.'"    *Id.* (citation omitted).    There is no "mechanical factors test" for the objective component; the "inquiry is necessarily contextual" and "fact-specific."    *Id.* at 478.    Here, the complaint alleges defendant Burroughs "deliberately grind his front part against plaintiff buttocks" while plaintiff was bending over to get some water.    [ECF 10] ¶ 24.    Carty's grievance was forwarded to the PREA Coordinator for investigation and determined unfounded.    [ECF 77-5, 77-6, 77-7].    On these facts, and absent more specific allegations as to the severity of Burroughs' conduct or the surrounding context, the Court cannot find that Carty has shown a reasonable probability that he will prevail on the merits of this claim.    *See Ricks*, 891 F.3d at 477 ("even if sexualized touching lacks a penological purpose, it may still fall below the threshold of constitutional cognizability based on a lack of objective seriousness").[28]

Finally, to the extent Carty argues his placement in segregated confinement constitutes an atypical and significant hardship, he also has not shown a reasonable likelihood of success on the merits of this claim.    To the extent Carty intends to raise this as an Eighth Amendment claim,

---

[28] The court in *Ricks* rejected a "zero tolerance [standard] for all minor sexualized touching in prison, such that all claims are objectively serious to a constitutional degree."    891 F.3d at 477.    The court reasoned that while both the federal government and nearly all states have outlawed sexual activity between guards and inmates, such legislation does not "compel a finding that all inappropriate touching is *per se* unconstitutional."    *Id.*    The court further observed that the PLRA defines "sexual act" to "explicitly exclude[] touching that is unintentional or 'through the clothing.'"    *Id.* at 478 (citing 18 U.S.C. § 2246(2)).

"[s]egregated detention is not cruel and unusual punishment *per se*, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." *Young*, 960 F.2d at 364; *see also Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."). Here, defendants have provided evidence and a sworn affidavit describing Carty's "extremely violent tendencies" and his placement "in the Segregated Housing Unit due to him not being able [to] live in General Population." [ECF 48-1] ₱ 10; [ECF 79-6]. "The decision where to house inmates is at the core of prison administrators' expertise," *McKune v. Lile*, 536 U.S. 24, 39 (2002), and they are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (citation omitted).[29] As such, segregated confinement "may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks." *Young*, 960 F.2d at 364. Further, while Carty complains about his food, the physical conditions of his cell, and restrictions on showers and recreation, the Court has found that Carty has not shown a reasonable likelihood of success on the merits of his conditions of confinement claim. For the same reasons, Carty has not shown that he is likely to prevail on a

---

[29] *See* 5 V.I.C. § 4508 (granting BOC authority to establish programs and procedures for classification of inmates, and to "prescribe rules and regulations for the maintenance of good order and discipline in institutions, including procedures for dealing with violations"); *see also McKune*, 536 U.S. at 39 ("An essential tool of prison administration . . . is the authority to offer inmates various incentives to behave. The Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit."); *Meachum v. Fano*, 427 U.S. 215, 229 (1976) ("The federal courts do not sit to supervise state prisons, the administration of which is [of] acute interest to the States."); *Hodges v. Klein*, 421 F. Supp. 1224, 1237 (D.N.J. 1976) ("the Court's own views on how the [BOC] should be run and how other prison policies and programs should be carried out are not relevant, for it cannot '. . . as a federal court . . . command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or personally repugnant'" (citation omitted)), *aff'd*, 562 F.2d 276 (3d Cir. 1977).

*Carty v. Testamark, et al.*
Civil No. 2023-15
Page 16

claim that his placement in segregated confinement violates the Eighth Amendment.[30]

To the extent Carty intends to challenge his confinement as a procedural due process deprivation under the Fourteenth Amendment, "[p]risoners generally have a protected liberty interest only in 'freedom from restraint' that 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Bond v. Horne*, 553 F. App'x 219, 224 (3d Cir. 2014) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).[31] "Lesser restraints on a prisoner's freedom are deemed to fall 'within the expected perimeters of the sentence imposed by a court of law.'" *Mitchell v. Horn*, 318 F.3d 523, 531 (3d Cir. 2003) (quoting *Sandin*, 515 U.S. at 484). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), and does not confer any right to a particular custody or security classification. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Nor does "confinement in administrative or punitive segregation . . . , without more, [] establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002).[32] Here, Carty's atypical,

---

[30] *Cf. Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981) (affirming finding that plaintiff's confinement in maximum security isolation cell did not constitute cruel and unusual punishment, where district court determined complained of conditions were not constitutionally inadequate).

[31] There is no single standard for determining whether a particular challenged hardship constitutes an "atypical, significant deprivation." *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). Rather, hardship is a function of the confinement's (1) conditions and (2) duration. *Id.* Additionally, the test "requires a determination of what constitutes the ordinary incidents of prison life, . . . referred to as the 'baseline' or 'base for comparison,'" *Nifas v. Beard*, 2009 WL 3241871, at *12 (W.D. Pa. Oct. 6, 2009), *aff'd as modified*, 374 F. App'x 241 (3d Cir. 2010), which "is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997). Finally, in conducting the hardship inquiry, a court does not "compare the prisoner's own life before and after the alleged deprivation." *Asquith v. Dep't of Corr.*, 186 F.3d 407, 412 (3d Cir. 1999). "Rather, we must compare the prisoner's liberties after the alleged deprivation with the normal incidents of prison life." *Id.*

[32] *See Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002) ("disciplinary detention and 'administrative segregation [are] the sort[s] of confinement that inmates should reasonably anticipate receiving at some point in their incarceration'" (alterations in original) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)); *Meachum*, 427 U.S. at 224 ("given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement

significant hardship claim is premised on the same factual basis as his conditions of confinement claim—i.e., deprivation of property, meals, recreation, etc.   Thus, because Carty has not shown a reasonable likelihood of success on the merits of the latter, neither can he show a reasonable likelihood of success on any Fourteenth Amendment claim.

In sum, considering all the evidence of record, Carty has not met his heavy burden to establish a reasonable probability of success on the merits of his claims to warrant injunctive relief.

## B.  Risk of Irreparable Harm to Carty

To satisfy this element, Carty must demonstrate that "irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22; *accord Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014); *see also Adams*, 204 F.3d at 488 ("the risk of irreparable harm must not be speculative").  This requires a "clear showing of immediate irreparable injury, or a presently existing actual threat."  *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (internal quotations and citations omitted).   It is not enough "for the harm to be serious or substantial, rather, it must be so peculiar in nature that money cannot compensate for the harm."  *Bieros v. Nicola*, 857 F. Supp. 445, 445 (E.D. Pa. 1994) (citing *Ecri v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)); *see also United States v. Pennsylvania*, 533 F.2d 107, 110 (3d Cir. 1976) ("mere injury, even if serious or substantial, is not sufficient").   In other words, "[t]he preliminary injunction must be the only way of protecting the plaintiff from harm."  *Instant Air*, 882 F.2d at 801.   And, because Carty seeks mandatory relief that will alter the status quo, he "must meet a higher standard of showing irreparable harm in the absence of an injunction."

---

do not otherwise violate the Constitution"); *see also Wilkinson*, 545 U.S. at 223 ("the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves"); *Denny v. Schultz*, 708 F.3d 140, 144 (3d Cir. 2013) ("In evaluating prisoners' due process rights, the court must be sensitive to the 'intricate balancing of prison management concerns with prisoners' liberty.'" (quoting *Sandin*, 515 U.S. at 478)).

*Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

Plaintiff alleges the irreparable harm he will suffer is "that he has been denied all his basic needs by staff, such as his food meals, showers, outside recreation exercise, properties, hygienes [sic], etc.," and that he is "kept under torturous conditions, in solitary confinement for years being physically mentally abused by staff, etc." [ECF 11] at 1. Carty contends "the continuing deprivation of constitutional rights constitutes irreparable harm." *Id.* at 2. He further alleges irreparable harm because of the nature of his injuries: "being unable to take care of his personal hygienes [sic] (his self) and his significant weight lost, looking like a skeleton, [and] malnutrition deficiency." *Id.* He also suggests that he has mental health issues that will become worse without proper treatment. *Id.* Finally, Carty states he "was in fact injured by prison staff and was taken to the emergency room for his injuries." *Id.*[33]

In short, the claimed irreparable harm is of the same type generally alleged throughout Carty's complaint, and for which he seeks monetary damages and prospective injunctive relief. This "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted); *see Instant Air*, 882 F.2d at 801 ("The preliminary injunction must be the only way of protecting the plaintiff from harm."). Thus, Carty has not shown an imminent injury that legal remedies cannot repair.

Moreover, as detailed above, Carty's allegations of irreparable harm are refuted by the record. In contrast to his claimed denial of basic needs, the Segregation Activity Log documents numerous dates that Carty refused showers, recreation, and meals. The record further documents

---

[33] As noted above, Carty has alleged similar harms in prior cases. *See supra* note 24. During his stay at Wellpath Recovery Solutions in 2019, Carty was described as "demanding and manipulative," and "wrote multiple baseless grievances . . . about perceived injustices or wrongdoing." [ECF 77-2] at 2.

that, consistent with BOC policy, Carty's personal property was removed from his cell when he was placed in disciplinary segregation.

Additionally, Carty's claim of extreme weight loss is simply not born out by the record. While there does appear to be an abrupt drop in Carty's weight from 150 pounds in November 2022 to 139 pounds in December 2022, *see* [ECF 91-1], this is nowhere near the 45-pound weight loss Carty claims, *see* [ECF 10-1] at 17.[34]  Nor are there any medical notations documenting concern about Carty's weight.   Further, his malnutrition diagnosis appears to be self-imposed: An April 21, 2023 nursing sick call note indicates Carty made a subjective complaint that "[b]ecause of my diagnosis of malnutrition lack of vitamins deficiency and lack of water to drink and sunlight, I am suffering from my nails changing colors and hair lost [sic] and experiencing blurry vision."  [ECF 77-1].   Carty made this complaint *after* Dr. Callwood opined that pictures of Carty's nails appeared to represent a vitamin deficiency rather than fungus growth and prescribed supplements.   *See* [ECFs 77 & 77-1].

Next, Carty makes no specific allegations as to any mental health conditions or symptoms, nor does he identify any requested or prescribed treatment that he was denied.[35]

Finally, while the record documents plaintiff's treatment for injuries following the March 2023 cell extraction incident, the record does support the severity plaintiff claims.   Nor are any injuries resulting from this incident so "peculiar in nature" that plaintiff cannot be compensated

---

[34] In a 2013 case, Carty alleged he was starving and weighed less than 100 pounds.  The head nurse at Red Onion State Prison submitted a sworn affidavit noting Carty's baseline weight in the Department of Corrections Offender Database was 135 pounds, and on May 2, 2013, he weighed 110 pounds.   W.D. Va. case no. 13-cv-234-JPJ [ECF 26-1] at 2.   The prison doctor stated "it appeared that Carty was trying to lose weight for some secondary reason . . . in what seems to be a modified hunger strike."  *Id.*

[35] While the complaint alleges plaintiff was denied medical assistance for bruises and muscle aches following an April 2022 incident with defendant Santiago, *see* [ECF 10] ¶ 37, defendants point out that plaintiff in his grievance did not allege any injuries or that he requested and was denied medical assistance, *see* [ECF 77-4].

for them following a resolution of this matter on the merits.

"The *dramatic and drastic power* of injunctive force may be unleashed only against conditions generating a presently existing actual threat." *Adams*, 204 F.3d at 487 (citation omitted). The facts discussed above fail to show any immediate, irreparable injury that will result if the Court denies injunctive relief. [36] Accordingly, Carty has not met his burden to "demonstrate[] a significant risk that he [] will experience harm that cannot adequately be compensated after the fact by monetary damages" or other corrective relief. *Adams*, 204 F.3d at 484–85; *see Bennington Foods*, 528 F.3d at 179 (party seeking mandatory relief "must meet a higher standard of showing irreparable harm"); *see also Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) ("injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties" (citation omitted)). Furthermore, "[p]reliminary injunctive relief is not a tool for prisoners to use to regulate in every way, every day, the terms and conditions of plaintiff's confinement simply because they are 'in court.'" *Stile v. Fed. Bureau of Prisons*, 2017 WL 2656646, at *4 (D.N.J. June 19, 2017) (internal quotations and citation omitted).

Because the Court finds plaintiff has failed to meet his burden on the first two factors, the Court need not address the risk of harm to defendants and the public interest. The Court notes though that prison officials are better positioned than this Court to determine inmates' needs and appropriate housing classifications. "Absent a showing that such officials have engaged in constitutionally impermissible conduct, it not in the public's interest for the court to usurp the

---

[36] One district court explained that its prior conditional finding of "imminent danger" for purposes of granting leave to proceed IFP was consistent with its later finding that plaintiff failed to show "irreparable harm." *Brown v. Diguglielmo*, 2007 WL 4570717, at *3 n.5 (E.D. Pa. Dec. 26, 2007). The court reasoned: "The evidentiary burden required to warrant the 'extraordinary relief' of a preliminary injunction is substantially higher than the burden required to warrant an initial grant of leave to proceed in forma pauperis. . . . Moreover, 'imminent danger' is a distinct concept from 'irreparable harm,' requiring a distinct factual showing." *Id.* (citations omitted).

Bureau of Prisons' authority and micro-manage the [] needs of a particular inmate." *Berman v. Lamer*, 874 F. Supp. 102, 106 (E.D. Pa. 1995).[37]

Finally, plaintiff's motion for preliminary injunction seeks "largely the same injunctive relief sought in his [] complaint" such that "granting [his] requests at this stage in the proceedings would, in effect, fail to 'preserve the relative positions of the parties' until the merits of the case are considered and would instead amount to a 'final judgment on the merits.'" *Martinez v. Rivello*, 2023 WL 3376545, at *2 (3d Cir. May 11, 2023) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).   For this reason also, plaintiff's motion should be denied.

## IV.    CONCLUSION

In sum, even construing plaintiff's *pro se* filings liberally, plaintiff has failed to demonstrate either a reasonable probability of eventual success on the merits or irreparable harm. As the Third Circuit has observed, "upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937). Accordingly, for the foregoing reasons, the Court RECOMMENDS that plaintiff's motion for a temporary restraining order and preliminary injunctive relief be DENIED.

Any objections to this Report and Recommendation must be filed in writing within 14 days of receipt of this notice.   Failure to file objections within the specified time shall bar the aggrieved

---

[37] One district court observed that the balance of hardships weighed heavily against an inmate's request for transfer to another prison, reasoning that:

> [G]ranting this injunctive relief, which would effectively have the federal courts making *ad hoc*, and individual, decisions concerning the treatment of a single prisoner, could harm both the defendants' and the public's interest.   In this prison context, the defendants' interests and the public's interest in penological order could be adversely effected if the court began dictating the treatment for the plaintiff, one inmate out of thousands in the state prison system.

*Reyes v. Walsh*, 2013 WL 1345491, at *5 (M.D. Pa. Feb. 22, 2013), *report and recommendation adopted*, 2013 WL 1344966 (M.D. Pa. Apr. 2, 2013).

*Carty v. Testamark, et al.*
Civil No. 2023-15
Page 22

party from attacking such Report and Recommendation before the assigned District Court Judge.

28 U.S.C. § 636(b)(1); LRCi 72.3.


**Dated:** January 5, 2024                                **S\**_____

                                                    **RUTH MILLER**
                                                    United States Magistrate Judge